We will hear argument this morning in Case 19-1434, United States v. Arthrex, Inc. and the consolidated cases. Mr. Stewart? Mr. Chief Justice, and may it please the Court, in Edmond v. United States, this Court held that Coast Guard Court of Criminal Appeals judges were inferior officers. The Court based that conclusion on the combined supervisory powers of the Coast Guard Judge Advocate General and the Court of Appeals for the Armed Forces. Here, the mechanisms by which the PTO's Director can supervise administrative patent judges substantially exceed the combined powers of the supervising officials in Edmond. The Judge Advocate General was authorized to promulgate rules of procedure for the Court of Criminal Appeals, and he could remove individuals from their judicial assignments without cause. The PTO Director can exercise those same two powers, but he has other important tools of control as well. The Director can promulgate binding guidance concerning substantive patent law. He can designate particular Board opinions as precedential, thus making those opinions binding on future panels. He can also decide whether any particular review will be instituted and which judges will sit on the panel, and he can de-institute a review even after it has been commenced. Arthrex focuses primarily on the purported absence of any mechanism by which the Director can review a panel's final written decision. But the Board can grant rehearing of any such decision, and the Director is a member of the Board and is authorized to decide which members will sit on any panel. The Director thus can convene a new panel that consists of himself and two other members of his choosing to decide whether any final written decision will be revered. The Director's power over rehearings is not plenary, since he must exercise it jointly with two other Board members. But in Edmund, the review authority of the Court of Appeals for the Armed Forces was not plenary either, since that Court could not reassess the factual findings of the Court of Criminal Appeals. Taken together, the Director's supervisory powers are fully sufficient to render administrative patent judges inferior officers. Mr. Stewart, that was a long list of things that the Director can do. But of course, the one thing that he can't do is just change the decision of the APJ. And the rest of those things, deciding whether to rehear, stacking in a non-pejorative way the panels, or rehearing guidance on hypothetical facts, they all seem to be more or less ways of twisting the arms of the APJs. And so it is sort of directly opposite to what the Appointments Clause was designed to do, which is transparency and making clear who's responsible. Here, the Director can pressure the APJ, but at the end of the day, he can say, well, that's not my fault, that's what he wanted. Why isn't that true? I'd say two things in response to that. The first are, the supervisory mechanisms that we've identified are transparent. If the Director issues binding guidance that says, here's how the patent laws apply to particular fact patterns, that will be done in the Director's own name, and the Director will have responsibility for it. Yeah, but the APJ is the one who's going to decide whether that so-called hypothetical applies in this particular case. And if he comes out with a different result, that's the executive decision, not the Director's rule about hypotheticals. Well, even if you focus on the mechanisms that are available after a final written decision is issued, the Board panel's decision will be the decision of the executive agency only if it is not reheard. And as I said in my opening, the Director's power over rehearings is not plenary, but it is substantial. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Stewart, you said it's not plenary, but it's substantial. How would we discern what is substantial? Well, I think what the Court said in Edmund was that the mark of an inferior officer is that the inferior has a superior and is supervised at some level by executive branch officials who are appointed by the President and confirmed by the Senate. And we don't have a bright-line test for this. But the Court in Edmund said the fact that the Court of Appeals for the Armed Forces can't second-guess the factual determinations of the lower court is not sufficient to make those lower court judges principal officers. Things can slip through the cracks, and supervision can nevertheless be sufficient. And that's essentially what we have here. Even if you just look at after-the-fact review, the Director has substantial control. But I think the Court should focus primarily on the mechanisms of control that are available in the first instance, issuing binding guidance and so forth, because the usual hallmark of supervisory authority is that the supervisor can tell the subordinate how to do the job before the subordinate does it. And the Director has ample tools there. Thank you. Justice Breyer? I'm just curious. You may not have thought about this, but maybe the SG's office has. But in Peekaboo, if we go back to that, I dissented and had a very long appendix with dozens and dozens of people that I suddenly thought were, they seemed to be like here, we used to call them hearing examiners. And really, they used to be civil servants. All kinds of shapes and sizes in terms of powers, and they suddenly all became officers of the United States. But the majority said, we're not saying they all are. We're just talking about Peekaboo. So are these people officers of the United States? Why, is my answer. I'd like a line, if you've ever thought of one, between the statement in Peekaboo and the majority. Don't worry. They're not all officers of the United States. Have you thought of a distinction there between the long list and Peekaboo, and would it apply here? We've essentially acquiesced in the proposition that the board, the administrative patent judges are officers rather than employees. As you'll recall from the briefing in this case, there was a period when they were appointed by the director and were thought to be employees. Congress changed the statute. It's not absolutely clear that that's so, but the mechanism of appointment is sufficient so long as they are inferior officers. I thought you might have done that, and I wonder if in the course of doing that, you thought of a line of some kind that might distinguish the dozens of people I put in that appendix from these people here and the majorities in Peekaboo. Well, I think that the court has drawn the line between officer and employee in terms of exercising substantial authority under the laws of the United States. Obviously, that's something very far from a bright line. I think it is significant in this regard that the removal provision that's applicable to administrative patent judges is the same removal provision that applies to officers and employees of the PTO generally. The removal provision signals that Congress didn't intend for these officers to exercise any unusual level of independence from the director. Justice Alito? Thank you. Mr. Stewart, suppose Congress enacted a statute providing that a deputy solicitor general shall have the final and unreviewable authority to decide whether the United States will take an appeal in any case involving the interpretation or application of one particular provision of one particular regulatory statute. Suppose the SG can decide which deputy is to review each case that falls into this category. The SG or the attorney general can issue guidelines on the meaning of the provision and the standard to be applied in deciding to take an appeal. But once a deputy makes a decision, let's say it's a decision not to appeal, nobody, not the attorney general or the president himself can countermand that. Would that be constitutional? I think it would be a close call. You would obviously be looking at Morrison v. Olson in order to assess the significance of the fact that the agency's authority was limited to a narrow category of cases and certainly the fact that the solicitor general could promulgate substantive standards that would bind the deputy in making his decision might lead you to conclude that that person is still an inferior officer rather than a principal officer. However that case would come out, here the decision of an ordinary PTAD panel is not final and unreviewable within the agency. It is subject to rehearing. The director is a member of the board. The director can appoint a panel that includes other board members in order to determine whether rehearing shall be granted. So that authority, as I've said, is not plenary. What if I change my hypothetical so that all of the deputies collectively could review the decision of this one deputy? Would that change it? I think that would change it somewhat. I think it would change it more if you said the solicitor general can sit on a panel that will review the deputy's decision and the solicitor general may sit on a panel with two other deputies and theoretically could be outvoted, but the solicitor general will not only issue guidance before the fact but can sit on the board that determines whether the deputy's decision will be overridden. Thank you, Mr. Stewart. Justice Sotomayor? Mr. Stewart, the other side's case comes down basically, I think, to just saying you're not an inferior officer if you can make final decisions that are unreviewable by the director. That's a fairly straightforward line. Yours is a bit more amorphous. I think it's what the chief was getting to. But I think that what I want to understand is what is your final test being judged against? I thought I heard a little bit of it when you said the director is setting the policies and procedures. He or she is the person who controls the outcome in the sense of setting what the policies and procedures are. Am I right that that's your baseline? That's certainly part of it, and I would agree that we don't have a right-line test, but that's in part because this court has emphasized that there is no exclusive criterion for determining inferior versus principal officer status. And what we are emphasizing is that the director has really two different forms of control. He can issue policy guidance that will be binding on board panels in cases generally, but the director also is a member of the board, can participate in the board's decision-making process in individual cases. For my colleagues, and there are some who don't like amorphous concepts or ones that don't have a yardstick by which to measure, what is the advantage of us keeping the Edmunds test? I think the advantage is that the government is so multifarious. There's such an enormous number of officers and employees within the executive branch that any attempt to formulate a right-line test would almost inevitably lead to anomalous results in some categories of cases. Even in 1787, the framers were concerned that it would be administratively inconvenient to require Senate confirmation for all officers. And since that time, the executive branch has grown enormously, but there's still just one president and there's still just one Senate. Thank you, counsel. Justice Kagan. Mr. Stewart, you put a lot of weight on the ability of the director to be part of a board that rehears a decision. I had thought that there was a usual mechanism for rehearing a decision, but there's a sort of permanent rehearing board, which the director does not pick the other two members of. I think typically the rehearing petition filed by one of the parties would be addressed to the panel, and the panel could decide whether to rehear the case if it believed that it had overlooked something. But because the director is a member of the board and chooses the composition of the panel, the director can always decide in an individual case, no, here the rehearing panel will be different. I'm sorry, you have to give me a little bit more about how this exactly works. There's a decision of a panel that the director doesn't like, and what does the director do? The director could sui sponte, convene a new panel, and what's known as the Presidential Opinions Panel, or the POP is the acronym, is presumptively composed of the director, the commissioner for patents, and the chief administrative patent judge, and that panel can sit to issue a binding decision, assuming that two members of the panel vote to do so. I think I was talking about that, that presumptive panel with those particular three members. The director doesn't really have full authority over the other two, does he? The other two might disagree with him. It's true, and in that sense the director's authority is not plenary. But in Edmund as well, if the Court of Appeals for the Armed Forces disagreed with the factual findings of the Coast Guard Court of Criminal Appeals, there was really nothing that the CAP could do about it. Factual determinations could slip through the cracks, and here the director can not only convene this panel, the director can issue policy guidance that explains the rules of law as the director understands them, and other panel members are obliged to go along. The only thing that really can slip through the cracks in the PTO setting is factual determinations with which the director might disagree but other board members might invoke it. Thank you, Mr. Stewart. Justice Gorsuch? Good morning, Mr. Stewart. Last term, the court in seal of law said that executive officials must always remain subject to the ongoing supervision and control of the elected president. Through the president's oversight, the chain of dependence is preserved so that the lowest officers, the middle grade, and the highest all depend, as they ought, on the president and the president on the community. I'm struggling to understand how that interpretation of our Constitution squares with your argument that not even the president of the United States, either himself or through his subordinates, can reverse a decision of APJ's. Where is the chain of dependence? Well, the president obviously appoints the director subject to Senate confirmation, and the director can be removed by the president. I understand the removal, but my question was focused on the supervision and control language in seal of law. Well, the president can issue instructions to the director and can terminate the director if the director doesn't comply. The director has various supervisory methods. Again, that's removal, and my question was focused on supervision. If the president disagrees with the decision or one of his designees down the chain of dependence disagrees with the decision, there's no remedy that the president has, correct? Well, there is a perspective remedy in the sense that the— I'm talking about the decision. I'm not talking about removal. No, there is a right of appeals to the federal circuit, but I think the same thing— That's a separate branch of government. Again, I'm talking within the executive branch, Mr. Stewart. There's no chain of dependence running to the president with respect to the supervision of a particular decision, is there? There is no ability to ensure that the factual findings of two other members of the panel could be overridden, but certainly, Arthrex's position wouldn't change any of that. That is, holding that the APJs are principal officers who must be appointed by the president with Senate confirmation wouldn't give the president any greater power of control over their decisions in the event that they were inconsistent with the policy of the agency. We're back to removal. Thank you, Mr. Stewart. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Stewart. I'm not sure this wolf comes as a wolf, Mr. Stewart, but I still think it may be a wolf, as Justice Scalia famously said, and he said, in those cases, it can be discerned by careful and perceptive analysis. So here's the sources of my concern on that front. First, this structure is a real break from tradition, which we've said in cases like Free Enterprise Fund and many others, perhaps the most telling indication of a constitutional problem is departure, the lack of historical precedent. The lack of agency review of the ALJ decision by someone who's appointed by the president with advice and consent of the Senate is absent here and is ordinarily present and historically has been present. And then second, the lack of accountability, as the Chief Justice said, and Justice Gorsuch was just saying, these are multimillion, sometimes billion-dollar decisions being made not by someone who's accountable in the usual way that the Appointments Clause demands, and the Director on Rehearing does not have the unilateral power to reverse. So, you know, if Congress is going to do that, they can eliminate agency review and prevent removal at will, then it's easy to make these APJs presidentially appointed and the Senate confirm they haven't done that. Where in that analysis has that analysis gone wrong? I guess the two or three things I would say are, first, it isn't unusual for administrative adjudicators to be appointed in the manner that's appropriate for inferior officers. I agree with that, but it's very unusual for them not to have agency review, as you well know. It certainly is the norm for the agency head to have the capacity to review their decisions. But as we know from Edmund, that doesn't have to be plenary review. The court in Edmund specifically addressed the fact that the Court of Appeals for the Armed Forces could not revisit the factual determinations of the Coast Guard Court of Criminal Appeals, and it said what's more important is that there is review, not that review is not plenary. And in addition, the director has substantial authority to instruct the judges as to matters of law, as to the director's own interpretation of the patent laws, and can insist that the judges comply with those instructions. The other thing I would say is, if you think that that is the constitutional problem, and if you think the constitutional rule is some Senate-confirmed official has to have plenary authority to revisit the decisions of the underlings, then the appropriate remedy would be to sever the provision in the statute that says only the board can grant rehearings. Thank you, Mr. Stewart. Justice Barrett? Good morning, Mr. Stewart. On page 38 of your brief, you talk about the strength of the removal power, and you say that because there's a deficiency of service standard applicable here and because the director can promulgate regulations, the violation of which might be cause for firing, that those are ways in which the director can exercise some back-end control of the APJs with whom he's not happy with their performance. But isn't it the case, you know, as Arthrex points out, that APJs get the protection of the MSPB, which means that at the end of the day the director is actually not the official in the executive branch that has the last word on the continuation in service? It's certainly true that the APJs would have, if they were removed from federal service altogether, they would have the protections of the MSPB. And I'd say two things about removal. First, in addition to removing APJs from federal service altogether, the director can remove them from their judicial assignments. And the court in Edmond said that was an important power of control, and that doesn't carry with it a right to MSPB. Actually, I wanted to ask you about that. What does that mean to remove them from their judicial assignments when it's APJs' judicial assignments are what they do? Are they just benched without pay or benched with pay? The two things that could be done. First, they could be assigned tasks such as rulemaking, training other employees, and APJs do sometimes perform those tasks. The second thing is Arthrex appears to concede that there's no constitutional problem with the PTAB adjudicating direct appeals from denial of patent applications. Arthrex acknowledges there's sufficient director control in that area, but there's not a constitutional problem. And so particular APJs could very feasibly be assigned to that kind of adjudicative work rather than to inter-parties review. I mean, is that sufficient control? The director is unhappy with some of the decisions on review and rehearing, and so he says, okay, well, from now on you can still do adjudicatory work but it's going to be this kind instead? Yes, I mean, especially if the director thought the problem with these officials is that in inter-parties reviews they are not being sufficiently compliant with the director's instructions. The other thing I would say about the removal provision is that in addition to providing a practical tool for control, the fact that the APJs are subject to the same removal protection as officers and employees generally indicates that Congress didn't intend for them to have any sort of special independence from the director. A minute to wrap up. Mr. Stewart. Thank you, Mr. Chief Justice. This court has emphasized that there is no exclusive criterion for inferior officer status, that the inquiry should examine all the tools of control taken together. Here the director has substantial tools of control well before a final written decision is issued. The director has a power that neither the Judge Advocate General nor the Court of Appeals for the Armed Forces had in Edmund, namely the ability to issue binding instructions that will provide rules of decision for administrative patent judges as they decide cases. Thank you, Mr. Chief Justice. Mr. Perry. Mr. Chief Justice, and may it please the court. Arthrex's proposal for a bright-line administrative review requirement rests on a single line from Edmund, noting that the military judges couldn't render a final decision unless permitted to do so by other executive officers. The court in that sentence was not announcing a requirement for inferior officer status. It was commenting on the narrow scope of CAF review, which followed its observation that the JAG could not provide advanced guidance to the military judges. In sharp contrast, the PTO director can and does give substantive guidance to the APJs. He also has unilateral institution and assignment power, and he can order review of any board decision. Moreover, only the director takes final action by confirming or canceling patent claims. APJs can't render any decision unless the director permits them to do so. They are inferior officers. Mr. Perry, if you won one of these adjudications, you know, in a case involving a billion dollars, which you can have, as Justice Kavanaugh pointed out, you know, you're going to call your client and say, we won the adjudication, and they're going to celebrate. And the next day, you're going to have to call them and say, ah, the director is granted rehearing. He's appointed himself and two others just think the same way he does to the panel. He's issued new guidance, saying in a so-called hypothetical case that looks like ours, it should come out the other way. And the APJ who decided your case is sent to Siberia. You would say that's not good news, and it would make something of a charade out of the adjudication. Yet you're relying on all of those powers to say that everything is all right. I mean, it really doesn't sound like any kind of adjudication that we would accept, you know, in a system characterized by due process. Mr. Chief Justice, whether or not there are due process considerations in any particular determination has nothing to do with the Appointments Clause question here, right? We have a structural allocation of power from the president through the secretary through the director to the APJs that is being respected and being followed in the chain of command. Due process is a separate issue, not presented in the petition, not presented in this case. There may well be due process problems in other cases, but that's not a reason to dilute or pollute the Appointments Clause. Justice Thomas? Thank you, Mr. Chief Justice. What would be your test for whether someone is an inferior officer? It seems to be almost a totality of the circumstances. Justice Thomas, the principal officers sit at the right hand of the president. The only ones this court has recognized are the ambassadors and the cabinet officers and the heads of agencies. One step removed. These individuals are three steps removed. So, you know, the secretary definitely is. The director may be. The APJs definitely are not. And that's the chain of command that the court has described over and over again. That would be one test. The other, the admin totality, the circumstances test, is supervision and control. And these officials are supervised and controlled in everything they do. How much supervision and control are you talking about? Can it be partial supervision? Does it have to be absolute supervision? It's really difficult to discern how much would be required under your test. Your Honor, the ultimate test is whether the president and his direct reports remain accountable for the operations of the agency. So if the Congress were to give total free reign to a sleeper agent embedded within the agency, that might be a problem. But where the chain of command is preserved and the director and ultimately the secretary and the president bear the responsibility and accountability, that is sufficient. And the totality of the circumstances here show that the latter is the case with respect to the patent office. Thank you. Justice Breyer? I'm just curious if you found other examples like the JAG example where the, say, the senior executive service, members of that have a lot of authority in dozens of different areas and they're different kinds of officials. And did you find any good examples which would help you where they do have, in certain areas, authority that really seems pretty unreviewable? Well, Your Honor, many executive officials, of course, have essentially unreviewable authority over narrow things. AUSAs, for example, get to make on-the-call decisions every day in court. And remember, we're making very narrow decisions here. What the board decided in this case is that the priority date of this patent was May 8, 2014. That is not a decision that our Constitution requires to be made by a principal officer or even reviewed by a principal officer. It's a narrow, case-specific, factual question that the board answered and we believe answered correctly. So the answer to your question is, yes, there are many such officers, but they are generally given the opportunity to decide narrow, case-specific, application-specific questions rather than broad questions of national policy. That's the dividing line in our government. Thank you. Justice Alito? Mr. Perry, your brief has a very interesting metaphor. You say that the test here is a Goldilocks test. Is it too hot? And you also, in your brief, tick off all the ways in which there is control over these APJs. So I'm going to go through these, go through your list, and eliminate them one by one. And you tell me when to stop, when we get to the point where we've crossed the line and there's no longer sufficient control. All right, so let's say that the director does not control whether to institute IPRs in the first place. He does not control how many and which APJs sit on which panels. He does not provide exemplary applications of patent laws to fact patterns that are binding on APJs. He does not control whether a panel's decision will be presidential. He does not direct whether a panel's decision will be reheard by controlling whether a presidential opinion panel on which he sits votes to rehear a case. He does not control how many and which APJs rehear a case. He does not decide whether to dismiss an entire APR proceeding rather than allow a panel's decision to become final. Where along that line did we cross the Rubicon? Your Honor, of course, the director has all those powers, and any one of them might be removed. If all of them were removed, then you'd have the sleeper agent I described. And every case has to be determined based on the powers Congress has actually conferred. And here, the suite of powers together, including one the court didn't mention, which is the director's final authority to confirm or cancel the patent claims, ensure that the political accountability rests at all times with the director, not with the APJs. If you can't tell me where along that line is the magic divider. Your Honor, if you want a magic divider, I would suggest that it is the relationship to the president. An officer three steps removed from the president is never or almost never going to be a principal officer because he is a subordinate. Thank you. Justice Sotomayor? Counsel, Justice Gorsuch asked a question of the assistant solicitor general about the right or the need to have someone in the direct control of the president. I'm assuming that that, as I've been thinking about that question, I wonder, isn't that totally at odds with an adjudicatory system of any kind? Justice Sotomayor, there is an inherent tension in agency adjudicatory type proceedings between adjudicative independence and presidential control. That balance can be struck by Congress in many, many ways and throughout history has been struck in many, many ways, so long as the channels of authority are preserved. I'll come back to what Mr. Stewart said. The advanced offering of guidance is more important in this context. For example, the director can identify problems coming out of PTAP panels and direct future PTAP panels not to make those mistakes, preserves both the political accountability and avoids those due process type problems that may arise in individual circumstances. That is the essence of supervision which is carried out every day at the PTAP and in the patent office. Thank you, counsel. Justice Kagan? Mr. Perry, Justice Kavanaugh mentioned to you that this is an unusual kind of structure with no automatic opportunity for review in the agency head. I was just wondering, is there a story behind this? I mean, how did this come to be and is there anything that we should take from that or is this just an unaccountably strange bird? It is the long and proud history of the patent office, Justice Kagan, the interference examiners about whom Arthrex never wants to talk. Going back to 1836, administrative agents have decided interferences, conflicts between two private parties over patentability, including priority date, the issue in this case, and they have always been appointed by the secretary. In 1870 and 1952 and 1975 and 2008, there is no question that those issues have always been decided by inferior officers. Much of that time, since 1939 in the interference context, without director review, and that is what has been carried forward into the modern tradition. So we have a patent-specific tradition that comes out of the examination process. These are sort of super examiners or review examiners or second-level examiners, and the examiners, of course, decide these same questions at the first line, and they are employees, not even officers. So the tradition we think that is relevant is that of the patent office, and the modern APJAs are very much in line with a long, long history that, in fact, stretches all the way back to the founding. And has Congress ever taken a look at this? Do we know that Congress has considered this and knows what is going on, and has it ever reached a determination on the appointments clause question? We do know, Justice Kagan, Congress for a brief period vested the appointment in the director and then changed it to the secretary to avoid appointment clause problems. There's a provision in the statute speaking of that, and specifically decided that they are inferior officers who can and should be appointed by the secretary, and that determination, we think, is entitled to a certain amount of deference. Thank you, Mr. Perry. Justice Gorsuch? Mr. Perry, I understand you and your colleagues on the other side disagree a little bit over the patent interference question and the history here, but in answer to Justice Kagan, is it fair to say that, yes, this is a rare bird in this area, maybe for historically contingent reasons, maybe considered, maybe not? This is an unusual animal in the sense that there isn't final review in the agency head. Well, there is reviewability in the agency head, but, Justice Gorsuch, to directly answer your question, since the APA was enacted in 1946, most agency adjudications follow either the APA 556, 557 categories or a close proxy, and the Patent Office doesn't. Of course, before that, there were many others. That's why the APA was enacted, and we would submit that the appointment clause is not a super APA. It doesn't require the president or Congress to follow the APA in any particular case. Is that a long way of saying yes, that this area is, if not too generous, very, very unusual? It is unusual, but it is also well and historically founded and, until now, unchallenged. Okay. And with respect to the soft power that is sometimes emphasized that the director may have over appointing different APJAs or extracting promises from certain APJAs about how they'll rule, did you admit that there might well be due process problems there? We certainly think that the PTAB structure and the decisions are subject to due process constraints, and that would be a legitimate source of concern if those kinds of issues arose. There is no such question or allegation or concern in this case. This is only a structural appointments clause question. Absolutely, they are, of course, subject to the due process clause and all of its constraints. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Perry. You mentioned that the other side's argument rests on a single line from Edmund, and that, of course, is the critical line from Edmund about the administrative judge context. Just to pick up on Justice Gorsuch, this does seem, and I think you acknowledge, a significant departure from general historical practice since the APA, which is a yellow flag, if not a red flag. And then your test to try to deal with that seems to resurrect Morrison v. Olson's test. I thought we'd gotten away from that in Edmund. Justice Alito's questions pointed that out. And what I'm worried about, this is the wolf, what I'm worried about is this gives a model for Congress to eliminate agency review of ALJ decisions and kind of fragment and take away from agency control going forward, because however this came about, to Justice Kagan's question, this would be a model going forward, and that would allow Congress to give extraordinary power to inferior officers, which is not how our government is ordinarily structured. And then to Justice Sotomayor's question, it seems like ALJs, there's two fixes. You can go with the executive model of ALJs, which is the traditional have ALJs and have agency review or removability. It's usually agency review, not removability with ALJs. Or you can make the APJs principal officers with presidential appointments, Senate advice and consent, if you want a more judicial model. But here, this hybrid gives enormous power to inferior officers, and it's really just out of the norm. Your response? Two responses, Justice Kavanaugh. First, this system fits neatly within, we would submit Justice Scalia's dissent in Morrison v. Olson, particularly footnote four in the surrounding text describing the role of subordinate officers in the interplay with removal powers. Second, I cannot emphasize enough that the director maintains the final authority under 318B to confirm or cancel any patent. The APJs do not cancel patents. The patent in this case is still valid. The board has declared it to be unpatentable, but the director has not canceled it. So to this day, three years later, nothing has happened because the director, the politically appointed, directly accountable to the president individual has not taken the actions specified by statute. The Congress has made a different determination here, but it is absolutely consistent with the dictates of the appointments clause. Thank you. Justice Perry? Good morning, Mr. Perry. So I want you to assume for the purposes of my question that you lose on the appointments clause issue, and I want to ask you about remedy. So, you know, the federal, think about, one unusual thing about the remedy here is that it's not one specific provision in the statutory scheme that's being challenged as unconstitutional. It's the way that they work together. You know, so we could, if we decided that it was unconstitutional, perhaps make all of the APJs subject to, say, their principal officers, and so they have to be subject to presidential appointments, senatorial confirmation. We could say, well, listen, we're going to strike the provision in the statute that says only the PTAB may grant rehearings so that the director has that authority. We could make them maybe at-will employees, so they're removable at the discretion of the director without having to go through the full process that we discussed before. That's a lot of discretion to give us in trying to shape a remedial remedy here. Why should we even assert the authority to do that, to sever? Justice Barrett, from my perspective, from, you know, where we think the statute, of course, is constitutional, and I don't mean to be flip, but if you tell me how we lose, we can tell you what the remedy is. So, for example, if the real problem here is the lack of agency reviewability, then the most direct line to a solution would be to sever the provision requiring board rehearing so that the director could unilaterally review. And there may be other remedies depending on where, if anywhere, the court were to find a constitutional violation. It is not where the Federal Circuit found it, and it's certainly not where Arthrex has identified it, which is to take down this whole system. You know, they don't actually want presidential confirmation. They don't actually want director review. What they want is for the court to blow up the whole thing because of a structural problem that, again, not to fight the hypothetical, we think doesn't exist. Thank you. A minute to wrap up, Mr. Perry. Mr. Chief Justice, principal executive officers sit at the right hand of the president and make national policy. They are the ambassadors, the cabinet members, and the agency heads who have no superior other than the president. The APJs here are three steps away from the president. The chain of command runs through the secretary of commerce and the PTO director. This court has consistently recognized subordinate officials in general and administrative adjudicators in particular to be inferior officers. APJs carry out policy. They do not make it. Findings like these have been made by inferior officers since the patent office was created, and APJs carry on that tradition. They are inferior officers. Thank you. Thank you, counsel. Mr. Lambkin. Thank you, Mr. Chief Justice, and may it please the court. Administrative patent judges do one thing, decide cases. Their decisions are the executive's final word, resolving billion-dollar disputes affecting the innovation landscape. They can even overturn earlier decisions by their own agency head to grant a patent. No superior in the executive has authority to review their decisions, to overturn their exercise of government authority. Accountability suffers. If a principal officer has review authority but refuses to exercise it and overrules subordinates, the president and the public can hold him accountable for that choice. But the principal is not accountable if the answer is, I have no authority. Congress made my supposed underlings the final word. Punishing APJs for decisions or guidance to prevent future error doesn't undo decisions already made. For parties, the decision remains the executive's final word. In 200 years, this court has never upheld such a scheme. Edmund emphasizes review by presidentially appointed Senate-confirmed officers. It's hard to imagine the Coast Guard judges there would be inferior officers if none of their decisions could ever be countermanded by a superior, which is why the Federal Circuit's remedy, striking APJ tenure protection, is no remedy at all. APJs would still be the final word of the executive for the cases they decide. It subjects APJs to unseen, behind-the-scenes pressures through which superiors could evade accountability. How to fix the statute is for Congress. Solutions point in opposite directions. Congress might want APJs to be presidentially appointed and Senate-confirmed as examiners in chief work for 114 years. Congress might want to grant the director express authority to review board panel decisions. That's how Congress fixed the problem for the trademark trial in the appeals board, the TTAB, last year. But this court can't pencil in those solutions. It's more respectful of Congress to allow Congress to choose how to structure the agency. I, of course, welcome the court's questions. Thank you, Mr. Lamkin. Why isn't it okay? I think Justice Gorsuch referred to this as the soft power of review. Why isn't, under our precedence and basic principles, why isn't it okay that the executive allow the adjudicators significant degree of leeway? Because they're adjudicators. They're coming up with particular factual determinations. And you don't want the politically accountable people to have the authority to overturn those in situations where billions of dollars are at stake. But at the same time, in terms of basic patent rules and approaches and guidance, you do want them to have that responsibility. Why isn't that a fair balance? Well, Mr. Chief Justice, the Constitution permits adjudication in the executive branch in part because some adjudication is executive in nature. But placing that function in the executive means that the key protections against executive overreach, which is accountability to the people for the decisions, has to be observed. Allowing unaccountable officers to decide those cases finally, stripping any accountable principle of authority to overturn them, defeats that structural protection. Now, the standard model for agency structure achieves both the impartiality of the initial decision and allows for principal officer review. And it ensures that the principal officer review, after the fact, has a principal officer taking responsibility for his decision to overturn the impartial adjudicator. This, by contrast, comes up with a situation where it doesn't make sense because you really can't be an inferior officer. You cannot be an inferior adjudicator when there's no superior who can review any of your decisions, ever. Well, not any of your actual decisions, but can certainly take actions that would redirect any mistakes that the director sees in how a particular case was handled for the implementation of patent policy according to the president's directives, the president's responsibilities. So, a regulation or punishment of the APJ after the fact simply doesn't change the fact that the APJ's decision is the final word in the case, the final word of the executive. So, for the parties aggrieved by the loss of valuable rights, there's no superior they can go to to ask them to countermand that bad decision. For the public and aggrieved parties wanting to know who to hold accountable for the decision, there's just nobody. The principal officer's response is, I have no authority to overturn those bad decisions. Congress stripped me of that power. That's the opposite of accountability. It's the nature of adjudication that you decide individual cases. If we're going to have accountability in adjudication, it has to be accountability for individual cases. Structural protections like these protect individual liberty. They have to apply in individual cases. What about the argument that as a matter of practicality, which is something that the government has to take into account, what you're supposing is really quite impractical. Hundreds and hundreds of administrative hearing examiners, as at least they used to be called, making these sorts of decisions. The notion of meaningful review of each one seems to me to be fanciful. Mr. Chief Justice, because the appointments clause is about accountability, what matters is legal authority. If the director thinks he's too busy to review a decision, if the director thinks they're too numerous to merit his attention, the public and the president can hold him accountable for that decision. But if the director's answer is, I have no legal authority to review those decisions, then he is not accountable at all. Thank you, counsel. Justice Thomas? Mr. Lampkin, why does that accountability matter in this case? Are you saying that you would actually get a better decision from the director? Your Honor, yes, we believe we would get a better decision from the director. But what matters is for individuals to understand when they are making these decisions that they are subject to potential review and reversal by their principal officer. Absent that oversight, there isn't sufficient guidance and control to ensure that they're inferior officers. In the end, we're ultimately entitled to a decision where a principal officer appointed by and accountable to the president has authority to review the decision. So how much review are you talking about? Could it be just pro forma review, rubber stamp review? How much review are you talking about to address your concerns? I think it's the availability of review. The lower federal courts don't cease to be inferior courts merely because this court denies certiorari in the vast majority of cases. It is the availability of review that makes them inferior courts in this court, the Supreme Court. And so it doesn't have to be actual review in any case. But in Edmond, for example, review is limited to issues of law. And so long as there is sufficient evidence on every element of the offense, the higher court couldn't overturn it. And so presumably, under proper circumstances, that would be an appropriate standard. But what you can't have is what we have here, which is not only can you not remove the supposedly lower officers, but the director simply does not have authority to overturn their decisions, no matter how vehemently he may disagree with them. In fact, he at most in any hearing sits in a panel of three, where he is outnumbered two to one by other inferior officers. So if I understand you, if Congress amended the relevant provision and gave discretion to the director, that would solve your problem? That's exactly how, yes, that's exactly how Congress fixed the problem for the trademark trial and appeals board. It inserted an express provision saying that the director has authority to overturn board decisions with which the director disagrees. But this court can't pencil in that sort of authority. The government attempts to get there by asserting that the court should strike, for example, the provision that says that only the board can grant a rehearing. But that wouldn't fix the problem at all. Let me ask you one more question then. Assuming that Congress addresses the problem by providing the director with discretion, could the director then delegate that authority to the APJs and the various structures within the organization to basically the way it exists now by statute, but the director accomplishes that by delegation, would that be okay? Your Honor, I think since the statute authorizes his review, that would be permissible so long as it's consistent with the statute, because the public and the president could hold the director accountable for his review. You could be in the exact same posture that you're in right now as long as he does it by delegation rather than by statute. Well, it wouldn't be the exact same posture, Your Honor, because if it's by delegation, he could always withdraw that delegation. If it's by delegation, he is accountable for having done the delegation. He cannot point his finger at Congress and say, Congress defied me of the power to overturn that decision. It would be his choice to not review the decision, his choice to delegate, his choice for which he is accountable to the president and the people of the United States. Justice Breyer? Following up on what Justice Thomas says, why is this an unusual matter of delegation? I mean, after all, the government is filled with all kinds of different people. Doctors in practice may have final authority to decide at the Veterans Administration whether you're on your right day for an appointment. Sergeants will decide what hill to take in the Army. Inspectors General may decide who is a whistleblower and have absolutely unreviewable authority to send something over to Congress to say what that whistleblower said. There are many shapes and sizes. And Congress, I mean, you're saying Congress can't restrict their authority at all, no matter what the shape and what the size? Or can they do it sometimes and not do it other times, and if so, when? I mean, it's pretty complicated. Justice Breyer, I think when you're talking about an adjudication, what's critical is the authority of a principal officer to be able to overturn the decision. But not for a doctor, not for a whistleblower. No, for policy decisions, that sort of regulatory decisions, it's often sufficient for you to have removal authority or the threat of removal, because those decisions can be overturned. True, but I mean, what about the Inspector General? Can Congress there give him some unreviewable authority to send him a letter with a whistleblower? So, of course, anybody who has oversight can always overturn that sort of executive authority. Congress delegates to the Inspector General the unreviewable power to decide whether to send a letter to Congress at the request of a whistleblower. Can Congress do that or not, on your theory? So, I think that sending a letter to Congress may or may not be substantial governmental authority of the sort that would be an issue. We have a finding out what you're looking for, is the other side is saying this. Given the complexity of the federal government, of course there are going to be vast numbers of different cases. So, we have three basic things to look at. What's the position in respect to the president of the individual? What's the nature of that job? And what is the nature of the delegation of nonreviewable authority? I mean, even magistrates and lower court judges decide things without review, such as denial of summary judgments. Or what's the nature of the authority delegated? What's the nature of the job? What's the distance from the president? And it all comes under the rubric policy. Is it taking too many policy matters away from the president? So, an adjudicator will have more authority, possible. And so will a whistleblower, Inspector General. And maybe somebody else won't. Maybe somebody in the nuclear rate, you see what they're driving at. So, what's your response to that? Justice Breyer, I think when you have adjudications, it's just in the nature of adjudications that you decide individual cases. And if you're going to have accountability in those decisions, which you must if you're in the executive branch, that accountability has to be for individual decisions. And if you have a supposed underling with unreviewable authority to decide the matter, you do not have accountability of the superior. You simply can't be an inferior adjudicator if there is no superior who can review any of your decisions ever. The Constitution uses the word inferior only in the context of the lower federal courts. Those courts are inferior because their decisions are subject to this court's review. If there were courts out there where this court would have no authority to review their decisions ever under any circumstances, they might be lesser or coordinate courts. They wouldn't be inferior courts. For adjudication, being an inferior means having a superior who can review and overturn your decision. Justice Alito? Mr. Rankin, let's assume that we agree with you that this current scheme violates the appointments clause. You say in your brief, we shouldn't go any further. We should leave it to Congress to decide what to do to fix the problem. But that really doesn't answer the question of what relief you should get in this case. I assume you would not be satisfied if at the end of this case, the only thing that you obtain is a declaration that the current scheme is unconstitutional, but nothing is done to disturb the decision of the board, right? You wouldn't be satisfied with that. Correct. That would be essentially an advisory opinion for us. Because the IPR system is unconstitutional, this case can't proceed. There's no constitutional mechanism to which this case can be remanded. Accordingly, the IPR really should be dismissed. Well, you want us to go beyond simply saying that there was a violation, and Congress, you fix it as you see fit. You want us to grant, you want the judiciary to grant you a form of relief, namely a decision vacating the decision of the board. That is a form of relief. Why is that a more modest form of relief than some of the alternatives, such as saying that you are entitled to have the director review the decision of the board? Your Honor, I think the court couldn't create that mechanism without rewriting the statute. We wouldn't rewrite the statute. What the court would say is this is what the Constitution requires. Professor Harrison makes this point repeatedly, and it seems like a convincing point. The law is a combination of what the Constitution requires and any statutory additions to what the Constitution requires. So if the Constitution requires some alteration of the current statutory scheme, so be it. And that is an alteration that would possibly bring this into compliance with the Constitution. Your Honor, I believe there's the choice of how to have these decisions made, whether or not you elevate APJs to have them appointed by the President to make them true principal officers, or conversely, whether you would instead subordinate them to the director by making their decisions reviewed by the director. It's a sort of fundamental policy choice this court does not make. Congress, somebody in the judiciary has to make a choice about how this case ends, and I don't think it's an answer to say don't make any choice at all. Just say that we win. That is a choice. That is a form of relief, is it not? Yes, yes, and it is a form of relief, for example, this court gave in Sorrell. It said there's multiple possibilities of how the statute could be changed, but we are not the institution to be doing it. The legislature has to make that change, and I think that's precisely the case here because the possible solutions point in diametrically opposite directions. One is to make the officers, to make the APJs appointed by the President so that you have, so they're true principal officers. The other would be to make them truly subordinate to the director by making their decisions not final and at least subject to the possibility of review by the director. But since those and the multiple other possibilities point in such diametrically opposed directions, this court should hold that this IPR cannot proceed because the system is not constitutional. And then any remedy beyond that, any revision to the statute, would be a matter for Congress to address. Thank you, thank you, Mr. Lankford. Justice Sotomayor? Mr. Counsel, I find it odd, not odd to protect Congress's prerogative, but it's nothing that we do will tie Congress's hands. The one thing we do know is that they can change anything we do as a temporary remedy, assuming we were to rule in your favor. But I have a problem with our jurisprudence as it's developed in this hand, in these cases. In the founding generation, conceived of principal officers as synonymous with heads of departments. In early debates and enactments that structured executive department, heads of the department were referred to as principal officers and other members as inferior officers. There's a whole history that many of those inferior officers took final decisions in a wide variety of areas. Yet, that's the way we proceeded. The history also shows that early statutes gave non-principal officers the power to make final adjudicatory decisions on behalf of the executive. Your opposing counsel pointed out that as early as 1793, non-principal officers were given the power to adjudicate patent disputes. And in 1803, land commissioners were given the power to make final determinations as to a claimant's right to a track of land. I personally read this history as suggesting that principal officers were intended to be policy makers. And individuals who merely adjudicated claims based on set policies were not principal officers. So for me, the person that has to be held responsible is not the individual ILJ or ALJ who is making a decision. It's the person who creates the policy. And for me, it's clear that APJs are not policy makers. All of the policies are vested in the director. Presidential power is put in the director. The ALJs cannot influence the course of the law. That's only the director. So please tell me why the individual decision based on a quasi-law precedent and policy set by the director is a final decision that that director won't be held responsible for. Well, Your Honor, I think the short answer is if the director has no authority to overturn it, then the director isn't responsible for it. It's not his fault. I'm having a problem with that. If the APJ makes a mistake under the policy set by the director, that is going to be reviewed by the courts. Your Honor, these require applications of law to facts. There's credibility determinations. It doesn't make you an inferior officer simply because somebody in a coordinate branch could review your decisions. If that were the test, then the heads of departments and the members of the cabinet would be inferior officers also because their decisions can be reviewed by the courts. Under Edmund, to be an inferior officer, you have to be subject to the supervision and control of a principal officer. That doesn't mean that you can only have one single head of agency principal officer in any agency. Madison, as we pointed out in our brief, expressly recognized the fact that you could have other principal officers subordinate to the heads of departments. Just one last point. I just ignore the history under your view and what it teaches us. No, quite the opposite. I think the history of the arbitrators that you mentioned, they would decide just a single case. That has two consequences. First, because an arbitrator doesn't have a continuing position, historically, they would not be treated as an officer at all, as the Alfmore and the 2007 OLC opinion make clear. They're like jurors. Jurors have important responsibilities for cases, but they're not officers. Second, because the role is only temporary, and for a single case, such an arbitrator wouldn't be, would at most be an inferior officer, as under Morrison. Mr. Lampkin, suppose that there was review by the director in this case, but the review was under a clear error standard. Would that be enough? Your Honor, I think consistent with Edmund, a clear error standard, legal, would probably be sufficient in light of the other means of control that the director has. And how about if it was under an egregious error standard? I think, Your Honor, at some point where the authority of the director is so cut off that he is not able to say with any accountability that the final decision of the APJ represents the views of the United States, that this is a decision that he is willing to stand behind as the word of the PTO, then I think at that point... Let's think about what you just said in reference to Edmund. In Edmund, as you said, and this is why you said a clear error standard would have to suffice, the standard was, is there competent evidence in the record? Now, if I think about that standard, I mean, when is there not competent evidence in the record? So I guess I'm wondering how Edmund, is it all consistent with some of the statements that you've been making this morning? You said that, you know, if the head of the agency can say he had no authority, if the head of the agency can say it's not his fault, then that dooms the system. But the CAF could have said all those things. We have no authority. It's not our fault. There was competence evidence in the record. I mean, it wasn't very good evidence, and the evidence in our view was outweighed by much better evidence, but it was competent, so it's not our fault. Your Honor, of course, the CAF could also review all errors of law, and we would think that the PTO director would have to be able to do that as well. Well, but with respect to many decisions, the critical question is what the evidence says. And, you know, putting aside whether there's de novo legal authority, you know, many decisions the CAF would be able to say, you know, this was in the end a decision about the evidence, and we basically have no authority with respect to judgments about how good the evidence is. As long as there's, like, something there, we have to go along. It's not our fault. Well, Your Honor, I think the answer is that one thing that Congress can't do and still maintain you as an inferior officer is to say that your adjudicative decisions are not subject to review by any principal officer under any circumstances. That simply goes too far, and that's what we have here. I mean, I guess what I'm just wondering is whether this doesn't suggest that this question of review is something that's not an on-off switch as to this single issue, but something that needs to be put into the mix and needs to be considered along with all the other evidence of control that the agency head has. The reason why this competent evidence standard was okay in Edmund was not that, you know, it itself was there, because, you know, a competent evidence standard doesn't give you much. It was because it was combined with a raft of other things. I think, Your Honor, it's correct in the sense that the ability of a principal officer to review the supposed inferior's decision is a critical but perhaps not always sufficient condition. But you really can't call them an inferior officer if the answer is for the superior, I have no authority to review your decisions at all under any circumstances. If we're being honest, Mr. Lampkin, wouldn't you think that the director can probably get the precise result he wants in a higher percentage of these cases than the TAF could have gotten in Edmund? No, Your Honor, I don't think so, because, you know, for example, he cannot conceivably anticipate every conceivable factual scenario, every conceivable distinction, every single thing that an adjudicator might come up with along the way. Thank you, Mr. Lampkin. Justice Gorsuch? Justice Gorsuch? I'm sorry. Mr. Lampkin, if you'd like to finish that answer, I'd be grateful to hear it. Yes, you couldn't possibly come up with every conceivable along the way. And the idea of, you know, the fact that the government seems to try and contrive together ways that the director could possibly control the outcomes. For example, front-running APJ decisions with case-specific guidance, manipulating panel size or panel composition to achieve results, de-instituting to try and avoid bad decisions. All those contrivances to try and give the director some sort of control just show that Congress didn't give the director the critical authority you need for adjudications, the authority to review and overturn decisions so he can stand behind them as the final word of the United States. So, Mr. Lampkin, in our last couple of cases, seal of law and free enterprise, we were able to get in and get out rather cleanly, severing only the removal provisions. And, of course, that took care of the constitutional problem there. Here, you indicate that supervision is a real problem and more machinations are required. But the SG offers us what it thinks is a clean answer. I think it's about page 40 of its brief that we just sever the provision in section 6C that says only the PTAB may grant rehearing. Why isn't that sufficient? Your Honor, first, that's, of course, one of multiple options that point in opposite directions, but it wouldn't even fix the problem. Even if that would somehow give the director the ability to grant a rehearing, despite the rule that the body with authority to decide cases initially usually has the authority to grant a hearing, not somebody else, but the director still wouldn't have unilateral authority to decide cases on rehearing. The statute still says decisions are issued in panels of three in which the director is at best outnumbered two to one. All right, so we'd have to blue line not only that language in 6C that says only the PTAB, but you're also pointing out that first part of section 6C that says shall be heard by three members. Fine. Would that do it? Would that solve the problem? I think, you know, Congress could rewrite the statute that way. But trying to take the director and insert him above the board where Congress made him only one member, trying to insert the director as a single decision maker where Congress provided for people to sit in panels of three, that isn't a surgical solution. That's vivisection. Are there other portions of the statute we'd have to eliminate or add to? No, but it would still, I think that you would have to strike at least those two. But that would be a radical alteration of the scheme Congress established. Panels of three were an important protection against idiosyncratic thinking. They ensure a necessary breadth of expertise. They provide a check ensuring that you have decision makers of different backgrounds. And it would be a departure from historical practice of having the APJs sit in panels of three. But ultimately the problem is there's two opposite ways that one can go here. One can elevate the APJs and provide for them to be presidentially appointed and be true principal officers as examiners-in-chief for 114 years. Or you can try and subordinate them by making the director the final decision maker and give him capacity to overturn decisions within which he disagrees. One option you've given us is to simply set aside the IPR determination, remand the case to the agency, and then wait for Congress to fix the problem. I'm sure some would argue that, well, that could take a long time. What's your response to that? Well, Your Honor, so Congress, when it addressed the problem, it has already addressed the problem with respect to the trademark trial and appeals board. In addition, Congress has already held hearings. It has before it ready-made solutions, one historical, one more recent with a TTAB available. And there's only 750 of these IPRs currently pending approximately, which is a little more than three per IPJ. Congress could readily make it possible for these to be refiled if it chose in a new and constitutional system. Ultimately, it's more deferential. It's more respectful of Congress to give Congress the ultimate authority and give Congress the choice of what it believes is the right answer for the structure for an agency responsible for technological innovation and important property rights. This court shouldn't be placing a thumb on the scale in giving judicial imprimatur to one of multiple diametrically opposed solutions. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Lampkin. I want to follow up on some other of my colleagues' questions and then turn to severability. First, following up on the Chief's questions, my understanding of your position is that you take the position that ALJs within the executive branch may be somewhat of an uneasy constitutional solution, but it's historically settled. We have tenure protection plus agency review, and that gives due process but also gives ultimate agency control of policy. That's kind of a historically settled solution. You want to preserve that, correct? That's exactly right, and it was also that type of solution that persisted for hundreds of years with respect to initial examinations and with respect to interferences as well. And here the problem is Congress departed from that tradition by keeping the due process part without the agency review part. And you can either keep the review if you want to keep them as inferior officers or if you want to avoid any agency review, Congress can do that too, but that, they'd have to do presidential appointment and Senate confirmation of the APJs, correct? That's right. If history means anything, this is an outlier. It's an aberration and an unconstitutional one at that. Okay, and then Justice Thomas asked about how it would be different if delegated, in other words, if the power of review were granted to the director and then it's delegated. Your answer to that, I think, was accountability. Is that correct? I think that's right. When a principal officer has authority and then chooses to delegate it to another, assuming that that's consistent with the statute, that principal officer is then accountable for the choice to delegate. If the attorney general says, I'm too busy to review these, I want somebody else to do it for me, the public and the president can hold them accountable for that choice. And then Justice Breyer asked about inspector generals. He asked about other officers too, but on inspector generals, my understanding is those are presidential appointed and Senate confirmed and there actually would be a pretty big problem if they were not, at least if they had tenure protection and were not presidential appointed and Senate confirmed. Do you have any different understanding of that? No, I wouldn't. Okay, is the Morrison test still alive after, the Morrison test for appointments clause purposes still alive after Edmund? So, Morrison relied heavily on the fact that the officer was appointed for a limited duration and for a single task, a single investigation. Whatever one might think of that, it's a completely different matter entirely to have an entire branch of an agency with 200 or more permanent positions that are adjudicating case after case after case without the possibility, without authority and a principal officer to overturn their decisions. Edmund, just to clarify one thing, I think this comes from Justice Kagan's questions. In Edmund, there was both review of some sort, she asked you to pinpoint that, but review of some sort, but also removability at will, correct? That's right. They could be removed from their positions and there was review of some sort. And here we have exactly the opposite. Let me turn, because I've got to turn quickly to severability. So, if we agreed with you on the merits, you want to then take down the whole system, and we frowned upon that repeatedly. And severability, I mean, maybe something of a misnomer in some respects, really follows from the nature of the constitutional problem. We declare what the nature of the constitutional problem is. We say, then we enter judgment, and then stare decisis means that that constitutional problem exists for all cases. Isn't the nature of the constitutional problem here the lack of direct or review, which would mean us saying 6C is the constitutional problem? No, Your Honor, because the problem stems also from the fact that the officers are not appointed by the President and Senate confirmed. Either one would be sufficient to address the problem. And it's not like separation of power cases where the officer is just the single problem. The officer is not subject to presidential control. And, therefore, all the remedies involve subordinating the official, clipping their wings, so to speak, or striking a novel restriction on removal. Thank you, counsel. Justice Barrett? Mr. Lampkin, I want to pick up where Justice Kavanaugh left off on the remedy here and severability. So, on pages 56 and 57 of your brief, you cite Sewell and Bauscher and Free Enterprise. And you cite them all for the proposition that if there are multiple ways to cure a constitutional problem in a statutory scheme, then the judiciary ought not be blue-penciling it. Can you think of any situation in which we have said, okay, well, there are multiple flaws in this scheme, but, you know, as Justice Kavanaugh was just saying, 6B seems to be the big problem. So, we're going to think it's the cleanest to go that route. Can you tell me the negatives that we've never done it? Oh, quite the contrary, Your Honor. In Sewell, that's exactly what this court did. It said there was at least five different things that are problematic combined. And it would be a matter of judicial policymaking in order to determine which of those should be removed. It's exactly the same problem here because you have… Well, no, no, no, counsel. I understand that we did that in Sewell. But my question is, have we ever done what we didn't do in Sewell? Which is to make a judicial policy choice? Yes, to make one that makes sense. I mean, let's say that Justice Kavanaugh is right and that it seems very sensible and makes a lot of sense to solve this problem, assuming that we say there is one, by saying 6B is the problem. So, that's the locus of the constitutional problem here. And we're going to say that that's what we're holding unconstitutional so that going forward, it's just that the PTAB can't have the final word. Well, the court could just as easily say the locus of the constitutional problem is the fact that these officers are not appointed by the… I understand that, Mr. Lansing. But what I'm asking is, can you cite a case, or are you telling me that there is none? Can you cite a case for the proposition where we have done just that? Understanding that that runs against what you want us to do here. I'm just asking, is there a negative? Is it the case that we've always had the position that we had in Sewell and we've never said that when there might be multiple provisions working together that create a problem or multiple ways of solving it, that we haven't just chosen one that makes sense? I think that you're right, Your Honor, in the sense that this court doesn't make that sort of judicial policy decision. When the possibilities are multiple and they point in complete opposite directions, this court recognizes that it's respectful of Congress to make Congress make the policy choice. And even if this court could somehow decide that as a policy matter it wanted to do one thing or the other, strike the appointment mechanisms for the ALJs, or somehow slice up the statute to try and reinsert the PTO director above the board, it's not a matter of surgical relief then. Okay, Mr. Lansing, let me pivot to the appointments clause issue. So Justice Kerrigan was pointing out there are many ways in which we would say that APJs are subordinate to the director. And it seems to me that one way to look at this case is to say that at a 10,000-foot level, if you look at front-end controls, if you look at hiring and firing and the ability of the director to set policy that the APJs must follow, in many respects they're inferior officers. And we might say that Congress has given them this one authority, this case-specific review authority, that is one that is inconsistent with the inferior officer role. But it does seem odd, doesn't it, to say that they are principal officers because they exercise this one piece of authority that seems to go beyond what an inferior officer can do? Well, that, Your Honor, is fray tag. Fray tag held that it may well be that a single officer has many responsibilities for those of inferior officers, but if that officer has authority that goes beyond that for an inferior officer, if the officer is the final decision-maker for the executive branch where he has no superior in that context, that officer is then a principal officer for all purposes and cannot continue in that office absent a proper appointment. Thank you, Mr. Lampkin. A minute to wrap up, Mr. Lampkin. Certainly. For adjudicators to be officers, inferior officers, they have to have a superior who can overrule their decisions before they become the final word of the executive branch. Because APJs don't have that superior, they cannot be appointed as inferior officers. The current IPR regime is, as a result, unconstitutional. I know that Mr. Perry pointed to Section 318B and the fact that the director does the final action, but Section 318B points out that, in fact, the director is made subordinate to the APJs because it says that the director shall issue and publish a certificate, cancel any claim, if the board finds the patent unpatentable. Severing APJ removal protections doesn't solve the problem because they still have no superior in the exercise of government authority. But how to fix this problem is a question for Congress because the possible solutions point in opposite directions. Congress might want them to be Senate-confirmed as an examiner-in-chief for 114 years, or it might want to subordinate them to the director, as Congress provided for trademark judges last year. Congress can provide an approach by amending the law, but this court cannot simply rewrite the statute, and it shouldn't allow the executive branch to try and jury-rig a solution through contriving a remedy. The respectful thing here is to let Congress to choose the path forward. The court should hold the IPR regime unconstitutional as constituted. The IPR proceedings against RTHREX, therefore, cannot continue, and the IPR should be dismissed. Thank you. Thank you, counsel. Rebuttal, Mr. Stewart? Thank you, Mr. Chief Justice. Mr. Lampkin referred to this court's ability to supervise lower courts by reviewing their judgments, but the principle means by which this court supervises the lower courts is not by affirming or reversing a few dozen lower court judgments every year. The principle means of supervision is this court issues precedential opinions that bind lower courts in future cases, and the court typically tries to exercise its certiorari jurisdiction in such a way that the legal rulings it issues will address questions of law that are both important and recurring. And similarly, in this case, it's important not to ignore the front-end mechanisms that are available to the director to influence the outcome of board decisions, both because they are the most practically efficacious means of using the director's resources and because these are the means that are most often characteristic of the exercise of supervisory power. Second, Mr. Lampkin said that the director can't be held accountable if the board issues a decision that people believe is wrong, and that's incorrect. The losing party in an IPR can always ask the director to convene a new panel to grant rehearing and to put the director himself on that panel, and if the director declines to take that step, he can be held accountable for allowing the panel decision to remain in place. The only imperfection in the director's accountability and review authority is that the director could be outvoted by the other two members of the panel that he convenes, but those other two members of the panel wouldn't be bound by any directives of law that the director had issued. The only practical fear is that those two people will disagree with the director's view of the facts, and to that extent, accountability is limited. But as Justice Kagan's questions pointed out, that's exactly what was going on in Edmond, that in Edmond, people who thought that the facts had been determined incorrectly could only blame the Coast Guard Court of Criminal Appeals judges. They couldn't blame any Senate-confirmed officer. The last thing I'd say is Mr. Perry referred to AUSAs and people in positions like that. They'll go into court conducting trials. They'll have to make snap decisions about whether to object to particular evidence, how to respond if the judge disapproves their proposed line of questioning. As a practical matter, these are decisions that often can't be undone after the fact, and so a blanket rule that an officer is a principled officer if he or she can do anything that binds the United States without being subject to being countermanded by a Senate-confirmed officer, that would be unworkable. Mr. Lampkin attempts to confine the rule he's advocating to adjudicative officials, but there's really no principled basis for striking that limitation. Edmond makes clear that administrative adjudicators are subject to the same Appointments Clause principles as other federal officers. Thank you. Thank you, counsel. The case is submitted.